UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| ERIC STEERE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 03-1900 (RCL) |
| GEORGE WASHINGTON UNIVERSITY SCHOOL OF MEDICINE AND HEALTH SCIENCES, | ) ) ) ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case arises from a dispute between plaintiff Eric Steere, and the medical school that dismissed him from its program, defendant the George Washington University School of Medicine and Health Sciences ("GW").

It is the second of two such cases decided this date. *Singh v. George Wash. Univ.*, Civ. A. No. 03-1681 (D.D.C. July 12, 2006) (Lamberth, J.)  Plaintiff Steere claims that GW dismissed him because of a disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12182(a) (2000) ("ADA").  Plaintiff initially named as additional defendants two administrators of the medical school, but this Court dismissed the complaint as to those two defendants in *Steere v. George Wash. Univ., et al.*, 368 F. Supp. 2d 52, 58 (D.D.C. 2005) (Lamberth, J.), and granted in part and denied in part defendant's pretrial motion for summary judgment.

The parties appeared before this Court for a non-jury trial on December 7-9 and 12, 2005. Plaintiff and defendant each presented several witnesses and a number of exhibits.  At the Court's direction, each party submitted Proposed Findings of Fact & Conclusions of Law [70,

71] on March 3, 2006. Based on all of the evidence presented, the Court makes the following findings of fact and conclusions of law and will, consistent with them, enter judgment in favor of defendant and against plaintiff.

## FINDINGS OF FACT

1. Mr. Steere's educational history reveals many academic achievements, along with some instances of poor performance and some indications of difficulty focusing. While plaintiff remembers struggling from an early age, he reports that he did not perceive himself as having "serious troubles with academics" until graduate school. (Trial Tr. 12/7/05 at 21.)

    (a) In elementary school, Mr. Steere reports that he took advanced classes, received average or better grades, and experienced no behavioral problems. (*Id.* at 90-92.)

    (b) In middle school, Mr. Steere noted that although his grades were above average (*id.* at 92), he found it difficult to focus in class, for which he was nicknamed "The Dreamer" (*id.* at 52-53). He also reports having difficulty learning math, penmanship, and problems paying attention. (*id.* at 170-71; Trial Tr. 12/8/05 at 11.)

    (c) In high school, he consistently performed in the 89th percentile or higher on multiple choice achievement tests administered annually (Trial Tr. 12/12/05 p.m. at 92-93), and achieved an above-average score on the Scholastic Aptitude Test (*id.* at 96-97).

    (d) Upon entering college, Mr. Steere struggled academically. He attributed

the difficulty to his practice of falling asleep during lectures, which resulted in poor recall of the information reviewed in class. (Trial Tr. 12/7/05 at 56.) To combat this problem, Mr. Steere reports beginning to drink several large caffeinated sodas per day. (*Id.* at 48, 157; Trial Tr. 12/9/05 at 56.)

(e) Through college, a graduate program in physical therapy, and into medical school, Mr. Steere reports that he did not struggle with sleepiness in class, and accordingly performed much better, in courses that involved oral examinations, practical teaching instead of long lectures, and shorter exams. (Trial Tr. 12/7/05 at 57-61.)

(f) Upon entering a graduate program in physical therapy, plaintiff reports that he repeatedly failed his tests until his professors enabled him to take his exams in an oral format. (*Id.* at 22.)

(g) Mr. Steere also reports that he was easily distracted when he studied on his own in a place where others were present, but that studying as part of an interactive group improved his concentration greatly, as did studying alone in a completely silent environment. (*Id.* at 33.)

(h) Tests sometimes posed a problem for Mr. Steere. After approximately an hour, he found his mind drifting. (*Id.* at 41.) He attempted to ameliorate this problem by taking short breaks during which he would eat and drink. (*Id.* at 40-41.) On time-pressured tests, however, this practice left him without sufficient time to read and answer each question on the test. (Trial

        Tr. 12/7/05 at 40.) When he noticed that time was running low, he would complete the remaining answers randomly. (*Id.* at 164-65.) Accordingly, his performance suffered.

2. Mr. Steere reports that he had difficulty remaining attentive in non-academic environments. For example, he reports that as a young boy he regularly fell asleep in church. (*Id.* at 152; Trial Tr. 12/9/05 at 54-55.) He also described how he was unable to conduct a patient interview while a television played in the same room. (Trial Tr. 12/9/05 at 48-49.)

3. Mr. Steere was a student at GW in the regular four-year doctor of medicine program from the fall of 2000 until the spring of 2003.

4. To attain and remain in academic good standing, students must not only achieve a passing grade in their courses, but their grades must also be within one standard deviation from the class mean in courses of three or more credits. (Def.'s Trial Ex. 26 at 32-33.)

5. If, in his first semester, a student receives a grade of Conditional or Fail in two courses, he is at risk of academic dismissal. (*Id.* at 32-33; Trial Tr. 12/9/05 at 62-63.) Thereafter, a student will once again be at risk of academic dismissal if he receives a grade of Conditional or Fail in any required course. (Def.'s Trial Ex. 26 at 32-33.) A student at risk of academic dismissal may be required to appear before the Medical Student Evaluation Committee ("MSEC"), which recommends to the dean whether the student should be dismissed at that time. (Trial Tr. 12/12/05 a.m. at 64.) The dean typically follows the recommendation of the

       MSEC.  (*Id.* at 127.)

6.       Mr. Steere struggled academically at GW.

    (a)       In his first semester, he received a grade of Conditional in Cells & Tissues and he failed Biochemistry.  (*Id.* at 66.)  He appeared before the MSEC on January 23, 2001, and reported that he felt anxious and was having difficulty studying effectively.  (*Id.* at 67-68.)  On the MSEC's recommendation and Dean Williams' concurrence, Mr. Steere took a leave of absence during the spring semester.  (*Id.* at 68.)

    (b)       Mr. Steere returned to GW in the fall of 2001, and enrolled in the first semester courses.  (Trial Tr. 12/12/05 a.m. at 70-71.)  He received a passing grade in each course.  (*Id.* at 70.)

    (c)       In the spring of 2002, Mr. Steere received a grade of Conditional in Physiology.  (*Id.* at 72.)  As this placed him at risk of academic dismissal, he appeared before the MSEC in June 2002.  (*Id.*)  Upon the MSEC's recommendation, Dean Williams permitted him to remain at the school, provided he successfully remediate the course over the summer.  (*Id.* at 73.)  Mr. Steere took the course again, and received a passing grade, in the summer of 2002.  (Trial Tr. 12/7/05 at 127; Trial Tr. 12/12/05 a.m. at 73.)

    (d)       In the fall of 2002, Mr. Steere failed Pharmacology and received a grade of Conditional in Microbiology.  (Trial Tr. 12/12/05 a.m. at 73-74.)  After hearing from plaintiff and reviewing his record on January 16, 2003, the MSEC voted to dismiss him for academic reasons.  (*Id.* at 75-76.)

7. Throughout his struggles in medical school, Mr. Steere consulted with numerous sources in an effort to improve his performance. First, he visited the University's counseling center in December 2000 for test anxiety and insomnia, but he did not complete the recommended treatment. (Trial Tr. 12/9/05 at 110-11.) Second, he met with psychiatrist Dr. Garro in the spring of 2001, complaining of the same symptoms. (Trial Tr. 12/7/05 at 82-83.) Dr. Garro wanted to continue seeing plaintiff, but Mr. Steere discontinued treatment after a few visits. (*Id.* at 119-22.) Third, plaintiff visited the University's Disability Support Services Center in January 2003. (*Id.* at 132-33.)

8. After being called before the MSEC in January 2003, Mr. Steere visited with Dr. Dorothy Kaplan and was tested for a learning disability. (Trial Tr. 12/8/05 at 4.)

   (a) Dr. Kaplan is a clinical psychologist. While the bulk of her experience is in the area of brain injury rehabilitation, she has some experience in diagnosing and treating young adults with learning disorders. (*See* Pl.'s Ex. 6; Trial Tr. 12/8/05 at 4.) Currently, Dr. Kaplan is in private practice, where she conducts, each week, approximately three assessments for learning disabilities. (Trial Tr. 12/7/05 at 177.)

   (b) After interviewing and testing plaintiff, Dr. Kaplan issued a written evaluation in which she concluded that Mr. Steere suffered from two learning disabilities: attention deficit hyperactivity disorder ("ADHD"),

        inattentive type; and a math learning disorder.[1]  (Trial Tr. 12/8/05 at 53-54.)

    (c)    Based on the learning disabilities Dr. Kaplan identified, she made several recommendations to accommodate plaintiff, including that he receive time and a half to complete his examinations.  (*Id.* at 61.)

9.    Dean Williams received Dr. Kaplan's report prior to his meeting with Mr. Steere in April 2003.  (Trial Tr. 12/7/05 at 17; Trial Tr. 12/12/05 a.m. at 21-22.)  Dean Williams concedes that, while he did read Dr. Kaplan's report, it had no effect on his decision to dismiss plaintiff for academic reasons.  (Trial Tr. 12/9/05 at 126; Trial Tr. 12/12/05 a.m. at 13, 21.)

10.    While the dean's ordinary practice is to notify students by mail of their dismissal from the program for academic reasons, he did not do so in this case.  Dean Williams attributes the failure to send a letter to an administrative oversight by his office.  (Trial Tr. 12/12/05 a.m. at 6.)

11.    After his dismissal from GW, plaintiff enrolled in the doctor of medicine program at the American University of the Caribbean, an unaccredited program.  (Trial Tr. 12/7/05 at 145.)  Plaintiff has been achieving passing grades in that program.  (*Id.* at 145-47.)

## CONCLUSIONS OF LAW

---

[1] Plaintiff does not claim that the math learning disorder diagnosed by Dr. Kaplan affects his ability to perform in medical school and thus does not seek relief for GW's failure to accommodate this disorder.  (Trial Tr. 12/7/05 at 89-90).  Accordingly, these Findings of Fact & Conclusions of Law shall not consider the math learning disorder diagnosis in considering the merits of plaintiff's claims.

**I. Legal Standard**

Plaintiff claims that GW's failure to offer reasonable accommodations before dismissing him constitutes discrimination in violation of § 12182(a) of the ADA. That section provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

As this Court noted in *Steere*, 368 F. Supp. 2d at 55, plaintiff must establish a violation of this provision by demonstrating "(1) that he has a disability; (2) that he is otherwise qualified for the benefit in question; and (3) that he was excluded from the benefit due to discrimination because of the disability." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998); *cf. Ferrell v. Howard Univ.*, Civ. A. No. 98-1009, 1999 WL 1581759, at 3 (D.D.C. Dec. 2, 1999), *aff'd,* 254 F.3d 315 (D.C. Cir. 2000). This Court shall consider, under a preponderance standard, each element in turn. *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

As to the first element, to prove that he has a disability under the ADA, plaintiff must demonstrate that (1) he has an impairment (2) that is related to a major life activity (3) and that substantially limits that major life activity. *Haynes v. Williams*, 392 F.3d 478, 481-82 (D.C. Cir. 2004) (citing § 12102(2)(A) of the ADA and construing its language that a protected disability is "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual").

**II. Analysis**

*A. Impairment*

Based on the evidence presented at trial, this Court does not find that plaintiff has a disability as defined by the ADA and case law.  Plaintiff has submitted insufficient evidence that his academic struggles at GW are due to a learning disability.  Specifically, this Court finds that plaintiff has failed to prove by a preponderance that his symptoms satisfy the elements required before one can be diagnosed with ADHD.

Expert testimony indicated that a key factor in diagnosing ADHD is early developmental onset.[2]  (Trial Tr. 12/12/05 a.m. at 68-70.)  What evidence plaintiff provides for this element is scant and anecdotal: he claims to have had difficulty learning math, poor handwriting and problems paying attention.  (Trial Tr. 12/7/05 at 170-71; Trial Tr. 12/8/05 at 11.)  He contends that his difficulties continued into middle and high school, and offers as proof the fact that he was a known daydreamer (Trial Tr. 12/7/05 at 52-53) and sometimes fell asleep in class, in church or while driving (*id.* at 152).  This Court finds this evidence to be insufficient.  Vague memories of falling asleep, or even of having trouble focusing, do not necessarily establish that one suffers from a disability.  To the contrary, in this Court's opinion, vew few children would not resemble plaintiff's description at some point in their youthful lives.  The factors he describes are characteristically childish: anyone who has been around children knows that they often have trouble paying attention.  (*See, e.g.*, Trial Tr. 12/12/05 a.m. at 69.)  These scraps of vague memories cannot sufficiently establish that plaintiff satisfies the early onset requirement.

The additional evidence provided by plaintiff also fails to satisfy the standard necessary

---

[2] Although, as noted *infra*, a diagnosis is not sufficient to prove a disability under the ADA, this Court finds that it is necessary.

9

for him to prevail. The record reveals that plaintiff enjoyed a great deal of academic success throughout his life, including his strength from a young age in areas that require an ability to concentrate and pay attention. Had he the disability that he claims to have, this Court might expect his achievement to have been more consistently impaired. Instead, plaintiff's educational career demonstrates strong academic achievement and ability – his test performance several times resulted in advanced placement, he attended numerous colleges and graduate degree programs, amassing a strong academic record despite personal struggles – and performed extremely well in many subjects. Indeed, to be accepted into the regular doctor of medicine program at GW, one must have a demonstrated record of achievement. (Trial Tr. 12/12/05 a.m. at 6-7.)

Although this Court accepts that ADHD could certainly affect plaintiff's ability to complete time-pressured multiple choice exams, it does not find that such a diagnosis is consistent with his success on various other academic tasks – undoubtedly some of them requiring concentration – on which he has repeatedly excelled. In any event, it is not consistent with a determination that any impairment substantially affects a major life activity. To the contrary, plaintiff appears quite able to succeed in the major life activity of learning, including test-taking in general.

Similarly, this Court is unconvinced that plaintiff's relatively recent academic difficulty is more likely than not due to ADHD. In his testimony, plaintiff seized upon his claimed learning disorder to explain why he was unable to convey on tests the material he knew that he had learned (*see, e.g.*, Trial Tr. 12/7/05 at 22-24, 36-37, 40, 159), but this Court finds, first, that such a discrepancy is not necessarily so unusual in competitive educational environments that it

requires some external explanation; and second, that it could be explained by many other factors. Test anxiety,[3] personal struggles,[4] lack of attention to detail, poor studying habits, lack of motivation, poor health,[5] insufficient time devoted to studying[6] – any or all of these factors might explain plaintiff's poor performance at GW and in the physical therapy program. That his poor performance has been a relatively recent phenomenon further supports the conclusion that the cause is due to temporary circumstances rather than a lifelong disability that has impaired, and continues to impair, his ability to perform in academic environments. Indeed, plaintiff's recent

---

[3] While plaintiff insisted that the GW counseling center overemphasized the extent to which anxiety affected his performance (Trial Tr. 12/7/05 at 31-32, 162), he later admitted that upon hearing the MSEC's recommendation that he be dismissed, he "collapsed inordinately for awhile," and considered their decision to be "quite a blow" (*id.* at 47). Dr. Kaplan testified that, in her clinical interview of plaintiff, she found him to be mildly depressed because of fear that he would be expelled from his lifelong goal of becoming a physician, which he had worked very hard to achieve (Trial Tr. 12/9/05 at 9), that he described himself as "very stressed" (Trial Tr. 12/8/05 at 38-40), and that he could reasonably have been diagnosed at that time with "an adjustment disorder with depression and anxiety" (*id.* at 57).

Plaintiff himself suspected that anxiety might be the cause of his academic difficulties: he repeatedly described his symptoms as relating to anxiety when he sought help from the University's counseling service (Trial Tr. 12/7/05 at 80-81), Dr. Garro (*id.* at 82-83) and Dr. Kaplan (Trial Tr. 12/8/05 at 67). It should also be noted that Dr. Kaplan, in determining that plaintiff's test scores were not affected by anxiety or depression, relied at least in part on plaintiff's self-report (Trial Tr. 12/8/05 at 40), although she recognized that it potentially raised reliability concerns (*id.* at 57-58).

[4] Plaintiff testified that he was involved in a tumultuous love affair during his first year at GW. (Trial Tr. 12/7/05 at 118.) The Court also received testimony that plaintiff had a family and personal history of depression, that his parents did not support his educational goals, and that he had struggled with body image and sexual identity issues. (Trial Tr. 12/8/05 at 12-14; Trial Tr. 12/9/05 at 46-47.)

[5] One possible cause of plaintiff's inability to focus and perform well is sleep deprivation: the Court received testimony that plaintiff suffered from insomnia and sleepwalking from a very young age (Trial Tr. 12/7/05 at 141; Trial Tr. 12/8/05 at 14), and that problems with sleep could certainly make it difficult to determine the extent, if any, to which plaintiff's struggles in medical school were due to a disability rather than the effects of the sleep problems (Trial Tr. 12/9/05 at 6-7). While Dr. Kaplan recommended that plaintiff undergo a sleep study in order to determine the cause of his sleep disturbances, plaintiff declined to do so. (*Id.*) Another factor the effects of which have not been excluded as impairing plaintiff's learning ability are the lingering effects from a severe head injury plaintiff suffered at age twelve, from which he suffered a hematoma, a seizure and memory problems. (Trial Tr. 12/8/05 at 13-14.)

[6] Plaintiff acknowledged that he has previously identified as a weakness a tendency to overextend himself. (Trial Tr. 12/7/05 at 85-87.) He also testified that he participated in a number of extracurricular activities while in medical school (*id.* at 130-32; Trial Tr. 12/9/05 at 77-79), that he maintained a part-time job (Trial Tr. 12/9/05 at 43), and that he performed better when he reduced his social interactions and outside commitments and increased the time he spent studying (Trial Tr. 12/7/05 at 124; Trial Tr. 12/9/05 at 51, 55-56).

struggles are uncharacteristic in light of his academic record, and may simply reflect his inability to successfully adjust to new, more competitive tests. It is possible, even likely, that plaintiff either did not encounter such difficulties in prior, less competitive academic environments, or simply that, in the past, he was better able to compensate for them.

While the preponderance standard does not require plaintiff to rule out every other possible explanation, he must demonstrate that his explanation is more likely than not true. Since this Court finds, however, that many other explanations remain plausible, this Court is not persuaded that plaintiff suffers from a disability as defined by the ADA that has substantially limited his academic performance. The report and testimony of Dr. Kaplan, on which plaintiff heavily relies, is insufficient to convince the Court for two reasons.

First, this Court does not find Dr. Kaplan's testimony and report to be sufficient, in light of the relatively sparse corroborating evidence, to establish plaintiff's claim that he suffers from ADHD. Dr. Kaplan appeared to this Court as generally competent, but she failed to demonstrate that she based her diagnosis of plaintiff on valid and reliable sources. This Court has already discussed the paucity of evidence that plaintiff's symptoms manifested themselves at a young age. Dr. Kaplan also chose to rely upon a questionnaire completed by plaintiff's mother, even though she noted that plaintiff had not lived with his parents for many years and that the questionnaire would ideally have been completed by a person who has been able to "closely observe" the patient. (Trial Tr. 12/8/05 at 41-42.)

Additionally, it is not clear that Dr. Kaplan sufficiently ruled out the effect that plaintiff's other conditions might have had on the test results. For example, plaintiff states that he suffers from shade degradation, a condition which prevents him from distinguishing different color hues

12

and contrasts.  (Trial Tr. 12/7/05 at 55.)  Dr. Kaplan, however, largely based her diagnosis on a test that required plaintiff to distinguish between different colors.  (Trial Tr. 12/8/05 at 45-47.)  Similarly, Dr. Kaplan employed a test that requires motor dexterity (*id.*) even though she knew that plaintiff suffered from an impairment in that area (*id.* at 35-36).  More generally, Dr. Kaplan considered several subjective, anecdotal and self-reported factors in arriving at her diagnosis.  (*Id.* at 19, 49-50, 53.)  While clinical observations may be useful to corroborate reliable test results, Dr. Kaplan's reliance upon them as diagnostic tools in the context of potentially unreliable test results may raise questions as to the validity of her diagnosis.  In light of all these considerations, this Court finds that Dr. Kaplan's testimony and report failed to persuade this Court that plaintiff's difficulties are due to ADHD.

Second, the Supreme Court has held that a mere diagnosis is not sufficient to establish a disability under the ADA.  *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999).  Rather, plaintiff must offer "evidence that the extent of the limitation in terms of their own experience . . . is substantial." *Id.*  As discussed in the next section, it is this Court's determination that plaintiff has not demonstrated that the extent of his ADHD is substantial in terms of his own experience.

   B.  *Substantial Limitation of Major Life Activity*

Plaintiff's own experience is replete with academic successes.  He performed very well in a number of educational environments before he reached graduate school.  Plaintiff contends that his ADHD impairs his ability to learn in the following manner: it inhibits his ability to absorb material taught during lectures; it makes it difficult for him to study the material after the lecture; and it impairs his ability to correctly complete test questions in the allotted time.  This Court is

unpersuaded, however, that his academic record is consistent with such a pattern. Plaintiff's evidence is largely anecdotal and based solely on his memory and his interpretation of events that occurred many years prior. Mr. Steere does not offer sufficient data to establish a consistent pattern of performance over the years of his formal education.

For example, Mr. Steere describes struggling in the physical therapy graduate program. He explains that he was able to bring his failing performance to a passing performance merely by changing the testing format. (Trial Tr. 12/7/05 at 21-24.) If he suffers from a disability that impairs him at each step of the learning process, this Court fails to understand how merely changing the testing format would solve the problem. It fails to explain, for example, how he overcame the effects of his claimed impairment in listening to the lectures and in studying the material. Rather, a more likely explanation might be that the test format enabled plaintiff to compensate for whatever non-disability reason accounted for his problems. It is entirely possible that plaintiff was motivated to study harder when he knew that he was facing a panel of professors for an oral exam, rather than multiple choice test. Indeed, a similar pattern appears in plaintiff's medical school experience: after receiving two inadequate grades in his first semester, and taking a leave of absence during his second semester, plaintiff appears to have returned to school with a renewed resolve to succeed. He describes aggressively amassing a study group and devoting a great deal of time to his studies. Not surprisingly, he passed all of his courses that semester.

If one accepts the disability hypothesis, these experiences are difficult to explain. It is unclear to this Court how plaintiff could, at times, overcome his claimed disability by varying his habits and, at other times, find himself utterly defeated by it. It is more likely, in this Court's

opinion, that plaintiff's inconsistent performance results from motivational problems or other personal problems that might be expected to manifest differently at different times – and in different environments – in plaintiff's life.  Another possibility is that either the material taught, or the type of knowledge sought by the tests, simply varied greatly from a physical therapy program at a local university to a top national medical school program.  Plaintiff explains, for example, that the oral exams in the physical therapy program gave him an opportunity to repeat back to his teachers what they had been telling him in class.  (Trial Tr. 12/7/05 at 22.)  It may well be that in a competitive medical school environment, simple regurgitation would not have been sufficient to achieve passing grades, regardless of whether it was elicited in written or oral format.  Additionally, it goes without saying that medical school, and the skills taught therein, cover a far broader range of complex material, and that successful doctors must be able to synthesize a great deal of material and view a patient in the context of innumerable factors.  Physical therapy, while undoubtedly a challenging and complex subject, is nonetheless a narrower subject.  That plaintiff might succeed in physical therapy while failing in medical school is not a discrepancy that is most likely explained by ADHD.[7]

More generally, if plaintiff has an impairment that substantially interferes with learning in such broad areas as listening, studying and test-taking, this Court would expect such interference to consistently appear throughout similar academic environments.  Indeed, as compared to someone who took a more traditional path of attending one college and one medical school,

---

[7] The same can be said of plaintiff's subsequent experience in a medical program at the American University of the Caribbean.  That plaintiff might succeed at an unaccredited medical program (while taking an ADHD medication) although he failed at a top national university (without the medication) does not represent a discrepancy that is most likely explained by ADHD.

plaintiff's attendance in numerous college and graduate programs[8] should provide ample sources in which to locate such a pattern. His recent failures in medical school, and relatively poor performance on some tests prior to medical school, have not been shown to be the result of his claimed impairment.

It should also be noted that defendant's expert witness, Dr. Rick Ostrander, has extensive experience in the field of assessing learning disabilities. (Def.'s Tr. Ex. 12; Trial Tr. 12/12/05 a.m. at 30-43.) He testified that, in his professional opinion, plaintiff's achievement in medical school was not necessarily inconsistent with his abilities. (Trial Tr. 12/12/05 a.m. at 83-88; Trial Tr. 12/12/05 p.m. at 91-105.) Dr. Ostrander noted that Dr. Kaplan's tests may have been affected by plaintiff's other conditions, such as color blindness and lack of manual dexterity. (Trial Tr. 12/12/05 a.m. at 63-66.) Finally, Dr. Ostrander also called into question the reliability of the tests Dr. Kaplan chose to administer: it is his professional opinion that low scores on the tests have not been proven to correlate with the presence of disabilities. That is, the tests do a poor job of "discriminat[ing] between normals and ADHD." (*Id.* at 65.) This Court finds Dr. Ostrander's testimony, on the whole, to be credible and persuasive.

In light of all the evidence, this Court finds that there are many other factors that could have impaired plaintiff's ability to perform well on tests – some of which were the result of plaintiff's own choices and study habits. Plaintiff has failed to demonstrate that his low scores on certain tests were the result of ADHD. Thus, those low scores are not sufficient to convince this Court that he has a disability as defined by the ADA. Similarly, considering all of the

---

[8] The record indicates that plaintiff attended no fewer than seven institutions of higher education over a ten-year period, in which he took a great deal of courses, including all of the pre-medical coursework, language classes, and two-year physical therapy Master's degree program.

evidence plaintiff offered, taken together, and in light of defendant's evidence, this Court finds that plaintiff fails to establish by a preponderance that he suffers from a learning disability cognizable under the ADA.  Accordingly, he is not entitled to accommodations and defendant cannot be held to have violated the ADA by failure to provide him with accommodations.  In light of this finding, this Court need not address the remaining elements of an ADA claim; namely, whether plaintiff was otherwise qualified or whether he was discriminated on the basis of a claimed disability.

As a final note, the Court would like to caution defendant that, as an educational institution, it is obligated to provide reasonable accommodations to students who demonstrate that they are entitled to them under the ADA.  Defendant's practice of dismissing a student after receiving documentation of the student's disability – and without even considering whether the disability exists – is imprudent given the possibility that the student actually does suffer from a disability under the ADA.  If the request for reasonable accommodations is received prior to the official dismissal, as it was in this case, defendant must consider it before issuing its final decision whether to dismiss the student.  This is necessary not only so that defendant can avoid being held liable in a lawsuit where a plaintiff prevails, but also because defendant ought to be concerned about whether students truly have learning disabilities.  A well-regarded institution of higher learning, such as George Washington University, should be committed to the success of all its students, and surely that entails a sincere evaluation of their abilities and needs before issuing a decision to dismiss them.

## CONCLUSION

For the foregoing reasons, judgment consistent with these findings of fact and

conclusions of law shall be entered for defendant.

A separate judgment shall issue this date.

Signed by Royce C. Lamberth, U.S. District Judge, July 12, 2006.